Filed 7/15/21  P. v. MacCaskie CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br>v.<br><br>EDWIN JAMES MACCASKIE,<br><br>      Defendant and Appellant. | A159875<br><br>(Contra Costa County<br>Super. Ct. No. 5-971561-6) |

Defendant Edwin James MacCaskie was convicted of felony murder for a death that occurred during a "debt collection" effort he planned and committed with cohorts to recover $25 purportedly owed for a drug deal. Defendant appeals from the denial of his Penal Code section 1170.95 petition following an evidentiary hearing.[1]

At the hearing, over defendant's objection, the trial court admitted into evidence the transcript of a parole suitability hearing, at which defendant discussed his participation in the crime.  Defendant maintains the trial court violated his Fifth Amendment right against self-incrimination in admitting his statements at the suitability hearing and his Sixth Amendment rights in sitting as the finder of fact during the section 1170.95 hearing.  He further

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1

contends that, even taking into account his statements at the parole suitability hearing, the evidence is not sufficient to support the trial court's finding that during the crime he acted with reckless indifference to human life. Because we conclude defendant's latter argument has merit, we shall reverse the order and remand for resentencing, and we therefore need not, and do not, reach defendant's constitutional challenges.

## BACKGROUND

The trial court had before it defendant's record of conviction, including our prior opinion affirming his felony-murder conviction (*People v. MacCaskie* (Nov. 30, 1998) No. A081484 [nonpub. opn.]), of which we, as did the trial court, take judicial notice.[2] (Evid. Code, §§ 452, 453.) The opinion states in pertinent part as follows:

> "Appellant and his friend Leandro Torres were in business selling methamphetamine on Frisbie Court in Concord. They considered themselves, respectively, as 'uncle' and 'nephew.' Their drug business had an account receivable of $25 from Duane Bracken, for methamphetamine received but not paid for. One evening in April 1997, at approximately 11 p.m., appellant and Torres drove to a Frisbie Court apartment, found Bracken, and demanded their money. Bracken was 'nervous' and 'tense.' Torres put his arm around Bracken's shoulders and said, 'Let's go outside.' As appellant, Torres and Bracken left the apartment, a witness heard a sound like someone being hit.

> "The three walked to Torres' parked car, in which Jason Trujillo waited in the back seat. Appellant slapped Bracken 'pretty hard.' Bracken took off running, and appellant gave chase. After Bracken had run about 60 feet, appellant shouted 'Get back here.' In Trujillo's words, 'I guess he [Bracken] was intimidated, and he came back.' Appellant did not touch Bracken as he walked back to the car, but stayed two and a half to four feet behind him.

---

[2] Defendant made no objection to the court's consideration of our prior opinion.

"Bracken got into the front seat of the car, between appellant in the driver's seat and Torres in the passenger seat. Trujillo remained in the back. Bracken was not pushed or pulled into the car, and did not try to get out. However, Trujillo testified that Torres 'motioned' Bracken into the front seat of the car 'because no normal person's going to get in the front seat with two guys.' As he drove, appellant slapped Bracken twice with the back of his hand and told Bracken he should have paid appellant and Torres their money. Appellant and Torres dropped Trujillo off. Trujillo once again heard appellant asking Bracken for his money, saying something about 'going to take a ride.'

"Bracken's body was discovered by police around 3:45 the following morning, in a field in nearby Pittsburg. He had been shot in the head at fairly close range. Several witnesses heard a gunshot in the field sometime between 10:30 and 11:30 the previous evening—about the time appellant and Torres were 'going to take a ride' with Bracken. Two of these witnesses heard three men arguing at approximately 11 p.m., then a shot, and then only two voices. Both appellant and Torres had been known to carry handguns. A tire track found at the field could have been made by Torres' car. About two hours after he drove off with Bracken, appellant encountered a Frisbie Court resident and told him that Torres 'got carried away' and shot Bracken in the head in Pittsburg."

Defendant was sentenced to 25 years to life.

At a parole suitability hearing (defendant's second such hearing) approximately three months prior to the section 1170.95 evidentiary hearing, defendant discussed the crime as follows:

He caused Bracken's murder by the influence he had on Torres and choices he made the night of the crime. Torres would not have killed Bracken if defendant had not given Torres the gun and had not taught him not to let anyone disrespect him. Defendant instigated the crime by finding Bracken at the apartment. He told "Sam Bot" to get Torres from the car, and defendant was the first person to hit Bracken. Defendant chased Bracken when he fled, would not let him go, and yelled at him to stop. Bracken stopped because

3

defendant intimidated him. When they were in the car, defendant escalated the violence by slapping Bracken twice. They were going to go to Pittsburg to buy drugs and to drop off Bracken. Defendant told Torres they would take care of the debt with Bracken some other time. Torres wanted to take Bracken with them and "smash" on him, meaning to beat him more. Defendant responded that it was Torres' issue and to take care of it.

Defendant recounted that he had given Torres the gun a couple of months before the crime for the same reason defendant had a gun, to intimidate and exert power—the "reality is, it was to kill eventually." Torres was then 17 years old, and defendant was 25 years old.

Torres took Bracken out of the car and began beating him. Defendant watched with approval, not caring what was going to happen to Bracken. Defendant finally told Torres Bracken had had enough, as defendant was eager to pick up some drugs in another deal.

When they returned to the car, defendant planned to drive Bracken to his apartment and drop him off. Torres then pulled out a .45-caliber automatic handgun and yelled at Bracken, "shut the F up or I'm gonna blow your effin head off." Defendant hit the brakes, put the car in park, and got out. Torres then got into the driver's seat and took off. As defendant walked away, he thought, "what the hell just happened?" and said to himself, "man, I hope he doesn't do what I think he's going to do" because Torres had threatened to blow Bracken's head off.

In hindsight, defendant realized if he had told Torres to put the gun away or to give it to him, that would have implied to Torres that he did not want him to murder Bracken. But by saying nothing, defendant had communicated it was okay for Torres to jump into the driver's seat, drive away, and kill Bracken.

4

When Torres returned, defendant asked about Bracken. Torres replied, "He's gone. He ain't coming back. I shot him in the head." Defendant thought he was lying, and Torres showed him where the body was located. Defendant then took the gun and got rid of it, and went on to Frisbie Court to complete another drug deal. He was approached by "Sam Bot" and told him Torres had gotten "caried away" and murdered Bracken.

Defendant was found eligible for parole.

## DISCUSSION[3]

In *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), our Supreme Court focused on the strength of the showing required to establish reckless indifference to human life. As *Clark* reiterates, that the Legislature included within the predicate crimes of felony murder only those crimes it viewed as " ' "inherently dangerous," ' " but "did not collapse the differences between an analysis involving felony murder, on the one hand, and an analysis of reckless indifference to human life, on the other." (*Id.* at p. 616, quoting

---

[3] "In evaluating a claim regarding the sufficiency of the evidence, we review the record 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 712.) " 'To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

" 'The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.' [Citations.] 'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also be reasonably reconciled with a contrary finding.' " (*People v. Westerfield*, *supra*, 6 Cal.5th at p. 713.)

*People v. Banks* (2015) 61 Cal.4th 788, 810 (*Banks*).) "Whether a category of crimes is sufficiently dangerous to warrant felony-murder treatment, and whether an individual participant has acted with reckless indifference to human life, are different inquiries." (*Ibid.*)

"Because *Tison*[4] is the source of the" reckless indifference to human life requirement, the court pointed out that "*Tison* observed that both the common law and Model Penal Code recognized this reckless indifference to the value of human life can be 'every bit as shocking in the moral sense as an "intent to kill" ' " and can therefore subject the defendant to the death penalty. (*Clark, supra,* 63 Cal.4th at p. 616, quoting *Tison, supra,* 481 U.S. at p. 157.) " ' In the common law, intentional killing is not the only basis for establishing the most egregious form of criminal homicide. . . . For example, the Model Penal Code treats reckless killing, "manifesting extreme indifference to the value of human life," as equivalent to purposeful and knowing killing.' " (*Ibid.*) Thus, reckless indifference embraces conduct so appallingly beyond the norm, even in the context of inherently dangerous felonies, that it tips the balance to permit imposition of the ultimate sanction our law allows—death.

With this understanding of the import of the reckless indifference to human life element, we turn to the five factors *Clark* identified as relevant to evaluating whether the evidence is sufficient to support a reckless indifference finding.

*Knowledge of weapons, and use and number*

*Clark,* as had *Banks,* emphasized that the "mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish

---

4  *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*).

6

reckless indifference to human life." (*Clark, supra,* 63 Cal.4th at p. 618.) In contrast, *Clark* noted "the high court in *Tison* found significant the fact" that the defendants " 'brought an arsenal of lethal weapons into the Arizona State Prison,' " and one of them " 'guarded the victims at gunpoint while they considered what next to do.' " (*Ibid.*, quoting *Tison, supra,* 481 U.S. at p. 151.)

Here, the evidence is sufficient to establish that both defendant and Torres were armed at the time of the collection effort and kidnapping. It further establishes that defendant supplied Torres' gun and was aware Torres was likely to brandish the weapon, and even use it during beatings. It does not establish, however, that defendant expected that, in the course of the instant crime, Torres would actually fire the gun, let alone use it to murder the victim.

*Physical Presence at the Crime and Opportunities to Prevent the Killing and/or Aid the Victim*

*Clark* observed that "[i]n *Tison,* the high court stressed the importance of presence to culpability. Each Tison brother was physically present during the entire sequence of events culminating in the murders. [Citation.] Proximity to the murder and the events leading up to it may be particularly significant where, as in *Tison,* the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is

7

arguably more at fault for the resulting murders.' " (*Clark, supra,* 63 Cal.4th at p. 619, quoting McCord, *State Death Sentencing for Felony Murder Accomplices under the* Emnund *and* Tison *Standards* (2000) 32 Ariz. St. L.J. 843, 873.) "At the same time, physical presence is not invariably a prerequisite to demonstrating reckless indifference to human life. Where, for example, a defendant instructs other members of a criminal gang carrying out carjackings at his behest to shoot any resisting victims, he need not be present when his subordinates carry out the instruction in order to be found to be recklessly indifferent to the lives of the victims." (*Clark,* at p. 619.)

Here, there is substantial evidence defendant was involved in nearly all of the events leading up to the murder. And there is no doubt defendant, himself, allowed Torres to beat up the victim and defendant, himself, struck the victim after he and Torres hauled the victim into the car. However, throughout this period of time, defendant did not allow the conduct to go beyond a serious beating.

There is also no doubt defendant was fully aware Torres pulled out his gun and yelled at the victim, "shut the F up or I'm gonna blow your effin head off," and that instead of trying to calm Torres down, defendant pulled to a stop and got out of the car. This effectively turned the car and the victim over to Torres' control, and defendant acknowledged thinking, "man, I hope he doesn't do what I think he's going to do," namely kill the victim. Defendant also admittedly did nothing at that point to try to stop Torres or to aid the victim. Instead, defendant proceeded on to his next drug deal. Accordingly, at this point, defendant did exhibit extreme callousness toward the victim.

8

*Duration of the Felony*

*Clark* further explained that "[c]ourts have looked to whether a murder came at the end of a prolonged period of restraint of the victims by defendant. The Tisons, the high court noted, 'guarded the victims at gunpoint while [the group of perpetrators] considered what next to do.' [Citation.] Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder. The duration of the interaction between victims and perpetrators is therefore one consideration in assessing whether a defendant was recklessly indifferent to human life." (*Clark, supra,* 63 Cal.4th at p. 620, fn. omitted.)

In *Clark*, the "defendant planned the robbery for after closing time, when most of the store employees were gone. Defendant anticipated some employees would be present, but the plan was to handcuff them in a bathroom, while the robbery itself was conducted outside of their presence. Thus, although the planned robbery was to be of substantial duration, involving multiple individuals loading computers into a U–Haul van, the period of interaction between perpetrators and victims was designed to be limited. Because the robbery was planned for a public space and involved the prolonged detention of employees, the crime did involve the risk of interlopers, such as Lee, happening upon the scene. But overall, the evidence was insufficient to show that the duration of the felony under these circumstances supported the conclusion that defendant exhibited reckless indifference to human life." (*Clark, supra,* 63 Cal.4th at pp. 620-621.)

Here, as in *Clark,* defendant did not plan the crime to be of long duration. The crime involved a single victim, who defendant did, indeed, plan or anticipate would be intimidated through physical coercion. But the

9

evidence also established that after the beating, defendant hauled the victim into the car and proceeded to drive the victim to an apartment where he would be released. There is no evidence defendant planned that the crime would entail any conduct beyond that, albeit the intimidation and beating might be aided by a display of firearms. But the latter action is not, as our high court has explained, sufficient to establish reckless indifference to human life. (See *Clark, supra,* 63 Cal.4th at p. 618.)

*Knowledge of Cohort's Likelihood of Killing*

*Clark* also explains that "[a] defendant's knowledge of factors bearing on a cohort's likelihood of killing are significant to the analysis of reckless indifference to human life. Defendant's knowledge of such factors may be evident before the felony or may occur during the felony. *Tison,* for example, emphasized the fact that the Tison brothers brought an arsenal of lethal weapons into the prison which they then handed over to two convicted murders, one of whom the brothers knew had killed a prison guard in the course of a previous escape attempt. . . . [¶] [In fact,] [t]he facts in *Tison* also indicate that the Tison brothers had advance notice of the possibility that their father would shoot the family because, in response to one of the victim's plea not to be killed, the father stated that he 'was "thinking about it." ' [Citation.] A defendant's willingness to engage in an armed robbery with individuals known to him to use lethal force may give rise to the inference that the defendant disregarded a 'grave risk of death.' " (*Clark, supra,* 63 Cal.4th at p. 621.)

In *Clark,* there was no evidence the killer "was known to have a propensity for violence, let alone evidence indicating that defendant was aware of such a propensity." Moreover, because the "defendant was across the parking lot while [the killer] carried out the first phase of the robbery,

10

defendant had no opportunity to observe anything in [the killer's] actions just before the shooting that would have indicated [he] was likely to engage in lethal violence." (*Clark, supra,* 63 Cal.4th at p. 621.)

Here, the evidence establishes that defendant gave Torres the firearm used in the crime and did so to enable Torres to intimidate individuals with whom the two interacted while plying their drug trade. Defendant was also aware Torres was willing and able to supply the intimidation and muscle to ensure their "respect." So, to this extent, defendant was aware of Torres' "propensity for violence." But there is no evidence Torres had a propensity for killing. While defendant commented that in carrying a weapon himself and supplying one to Torres, he was aware this meant at some point there would probably be a killing, the same can be said of any defendant who is aware their cohorts are packing a firearm while committing the crime. But, again, as *Clark* reiterated, the "mere fact of a defendant's awareness that a gun will be used in the felony" is not enough to establish deliberate indifference to human life. (*Clark, supra,* 63 Cal.4th at p. 618.)

*Efforts to Minimize Risks of Violence*

*Clark* addressed this factor because the "defendant was the principal planner and instigator of the robbery." (*Clark, supra,* 63 Cal.4th at p. 622.) The court concluded "a defendant's apparent efforts to minimize the risk of violence can be relevant to the reckless indifference to human life analysis. If the evidence supports an argument that defendant engaged in efforts to minimize the risk of violence in the felony, defendant may raise that argument and the appellate court shall consider it as being part of all the relevant circumstances that considered together go towards supporting or failing to support the jury's finding of reckless indifference to human life." (*Ibid.*) However, "the existence of evidence that defendant made some effort

11

to minimize the risk of violence does not, in itself, necessarily foreclose a finding that defendant acted with reckless indifference to human life." (*Ibid.*) "Therefore . . . a defendant's good faith but unreasonable belief that he or she was not posing a risk to human life in pursuing the felony does not suffice to foreclose a determination of reckless indifference to human life under *Tison.*" (*Ibid.*)

As we have discussed, defendant had not planned the "debt collection" effort and kidnapping to end in a killing. While there is abundant evidence he intended to traumatize the victim into paying the money purportedly owed to him, the evidence also establishes defendant stopped the physical abuse well short of Torres killing the victim, and thereafter started to drive the victim to the locale where he would be dropped off. It was not until Torres yelled at the victim in the car "shut the F up or I'm gonna blow your effin head off," that the possibility of lethal force entered the picture. At that point, defendant did, indeed, leave the victim to the mercy of Torres, with trepidation as to what Torres might do. On balance, then, the best that can be said about this factor is that it does not weigh in the balance either way.

In sum, this is unquestionably a close case. But bearing in mind that the reckless indifference to human life element, at its core, is meant to identify that inherently dangerous felonious conduct that is so heinous it may be punishable by death, we conclude the evidence here, even taking into account defendant's statements at the parole eligibility hearing, does not clear that formidable hurdle. Accordingly, the order denying defendant's petition for resentencing must be reversed and the matter remanded for resentencing. We therefore need not, and do not, reach defendant's Fifth and Sixth Amendment challenges.

**DISPOSITION**

The order denying defendant's petition for resentencing is reversed, and the matter is remanded for resentencing in accordance with section 1170.95.

_____
Banke, J.

We concur:

_____
Humes, P.J.

_____
Sanchez, J.

A159875, People v. MacCaskie

14